WATTS (WAGNER v.). See Case No. 17,040.

## Case No. 17,296.

WATTSON et al. v. MARKS et al.

[2 Am. Law Reg. 157; 5 Pa. Law J. Rep. 254.]

District Court, E. D. Pennsylvania. 1854.

OWNERS OF VESSEL—LIMITATION OF LIABILITY—CONTRACT OF AFFREIGHTMENT—DESTRUCTION OF VESSEL—PAYMENT OF INSURANCE.

1. The 2d section of the act of congress of March 3, 1851 [9 Stat. 635]. "To limit the liability of ship-owners, &c.," does not make the

absence of the "note in writing," required by the statute, a discharge of the ship-owner's liability on a contract of affreightment, where the true character and value of the enumerated articles have been fairly and clearly set down in the bill of lading, whether before or after the actual shipment; nor, it seems, where such character and value were in fact unknown to the parties.

2. Under the 3d section of this act, the personal liability of the ship-owners on a contract of affreightment ceases upon a total destruction of the vessel and loss of freight, before the completion of her voyage, though the actual damage to or loss of the goods to be carried, as in the case of theft, has taken place prior to the time of the destruction of the vessel.

[Cited in Norwich & N. Y. Transp. Co. v. Wright, 13 Wall. (80 U. S.) 127.]

[Disapproved in Walker v. Boston & H. Ins. Co., 14 Gray, 305.]

3. The limitation of liability of the ship-owner, by this section, is not affected by the fact that the vessel has been insured, and the insurance has been paid or become payable.

[This was a libel by Thomas Wattson & Sons against James Marks and others upon a contract of affreightment.]

Geo. M. Wharton, for libellants.

Mr. Waln and St. G. T. Campbell, for respondents.

KANE, District Judge. The respondents were owners, and Marks one of their number, was master of the steamship Union, which was engaged in June, 1851, in the business of transporting merchandise and passengers between California and the Isthmus. While she was so engaged, one J. B. Thomas shipped on board of her a quantity of gold-dust, belonging to the libellants, taking a bill of lading in the following words:

faithfulness and malversation of the defendants, their officers, servants and agents, and not by reason of any of the causes or acts mentioned as exceptions in the bill of lading." It is admitted that, in ordinary cases, when the contract of shipment and the delivery by the shipper have been proved, the burden is cast on the respondents of excusing the non-delivery at the port of destination, and that he must do this by proof that shall refer the loss to some one or more of the excepted risks. But it is said, that in this case, the contract was not defined, and ascertained according to the provisions of the act of congress of the 3d of March, 1851, and that the terms of that act forbid the libellants recovering in this proceeding, without regard to the asserted merits of their claim. The act referred to is the act "to limit the liability of ship-owners, &c." (Chapter 43 of 31st Cong., 2d Sess. [9 Stat. 635]), the second section of which reads thus: "And be it further enacted, that if any shipper of gold, gold-dust, &c., shall lade the same on board a vessel, without at the time of such lading, giving to the master, agent, or owners of the vessel, a note in writing of the true character and value thereof, and have the same entered on the bill of lading therefor, the master or owners shall not be liable, as carriers thereof, in any form or manner."

Upon the phraseology of this section it is agreed, that a carrier is not bound by the terms of his bill of lading to a shipper of gold-dust, unless it be shown that the shipper, at the time of lading, gave the note in

| | PACIFIC STEAMSHIP "UNION." | | | |
|---|---|---|---|---|
| Marks and Numbers, or Address. | Gross Weight, Avoirdupois | | Said to contain | Value. |
| | lb. | oz. | dwt | |
| Thos. Wattson & Sons. Philadelphia. | 30 | 2 | 00 | 375 ounces of gold dust. | 6,063 47 |

Freight through to New York. 2 per cent., - $121 27
Primage, 5 per cent., - 6 06
　　　　　　　　　$127 33

Rec'd Payment,
J. W. Raymond. Agent,
Per H. Ovington.

Shipped in good order and well conditioned, by J. B. Thomas, on board the Pacific Steamship "Union," whereof James Marks is commander, now lying off the port of San Francisco, and bound for Panama,—one package—packages weighing, gross, thirty pounds two ounces, and said to contain three hundred and seventy-five ounces of gold-dust, equivalent to six thousand and sixty-three dollars and forty-seven cents, but actual contents unknown, and being marked and numbered as per margin, to be carried and conveyed upon said steamer (with leave to tranship to any other steamers, and to touch at port or ports,) unto the port of Panama, from thence to be transported by Zachrisson, Nelson & Co., shipper's agents, across the Isthmus of Panama to the Port of Chagres, and from thence (with like leave to touch and tranship,) by steamer or steamers unto the Port of New York, and there in like good order and condition, the acts of God. enemies, pirates, robbers, thieves, fire. accident to and from machinery, boilers and steam, and the dangers of the seas. roads and rivers. of what nature and kind soever, excepted,) to be delivered unto Thomas Wattson & Sons, of Philadelphia, or his or their assigns, he or they paying freight for the same. two per cent., with five per cent. primage.

The transit on the Isthmus being at the shipper's risk, except for negligence.

In witness whereof, the commander or purser of said Steamer hath signed five bills of lading, all of this tenor and date, one whereof being accomplished, the others are to stand void.

Dated in San Francisco this thirtieth day of June, 1851.
James Marks,
Commander of the Steamship "Union."

On the fifth of July following, the Union while pursuing the voyage mentioned in the bill of lading, was wrecked on the coast of California; and at some time, either shortly before or after she struck, the package of gold-dust belonging to the libellants, was broken open, and its contents made way with by some person or persons unknown. The libel charges that this loss occurred in consequence of the "negligence, fraud, un-

writing, which the section speaks of. The position is a broad one, and in my judgment as dangerous as it is broad. It asserts a general proposition, that there can be no recovery against a carrier, where the conditions of the section have not been complied with; that the words of the act shall be taken literally, and that without any question of merits, however clear may be the breach of the carrier's contract, there can

be no recourse against him "in any form or manner," unless the shippers have given him the note in writing, at the time of the lading. It thus assumes that the statute may be legitimately interpreted, so as to shield, if not sanction fraud: for nothing, surely, can be more unconscientious, than that a carrier, obtaining the possession of a shipper's goods, under an engagement made with full and exact knowledge of its terms and import as well as object, and receiving in advance the consideration for which he stipulated, shall relieve himself from accountability, for loss, destruction or embezzlement of the goods, by an appeal to the words of the statute. It goes further than this, in its application to the present case. It holds for nothing, the defendant's admission upon our record of the terms of their contract, (see article 3 of answers,) and their acknowledgment that the contract was fully executed by the other party, that the freight was paid and accepted, and that the goods were delivered by the shipper and received on board by the carrier, in accordance with the terms of the bill of lading: either of which the acknowledgment of record, or the full performance on one side of a well defined contract, would take a case out of the statute of frauds, according to the sternest interpretation of that statute.

It was rightfully conceded on the argument, that with reference to this question, it is unimportant whether the contents were unknown to the carrier or not, nor whether they were truly represented by the shipper. They would have been equally unknown to the carrier, whether the note was given in writing or by parol; and he might, in either case, have called for proof that the representation was true. The note contemplated by the statute, would have been nothing more than the shipper's assertion in writing to the carrier, of the same facts, which the carrier, in this case, has admitted to be true, by his writing in the margin of the bill; namely, that the package he had received for carriage, was said by the shipper to contain a certain quantity of gold-dust. The question is not of integrity of representation by the shipper, or of his fidelity in the performance of all his engagements towards the carrier, but whether admitting the shipper to have framed and performed his contract in all good faith, he can call on the carrier to show that he also has performed his contract, or why he has not. In other cases that are supposeable, the extravagance of the interpretation which the defendants contend for, would be still more evident. Suppose the "true character and value" to be unknown to both parties, as was the fact with many of the earlier shipments from California, and not notified in writing, because unknown; or suppose the note in writing, to be given not "at the time of lading," but before or afterwards; would it be right to hold the contract of lading ineffective

against the carrier, because the statute had not been, or could not be literally complied with? Such cannot be the true reading of the act of congress. It was made to "limit the liability of shipowners," not to destroy it. Its object was to enforce fair dealing, to let both parties know what they were contracting about, what one was to carry, and what the other ought rightfully to pay. If this object is effected by the concurrent acts of the parties, it seems to me that the statute is satisfied. If the shipper took care that the "true character and value," or what he and the carrier believed to be the true character and value, was fairly and clearly set down on the bill of lading, and there has been from the first no misapprehension of fact on either side, I cannot think it important to inquire whether the entry on the bill was preceded by a written note, or whether the entry was in fact made at or before or after the time of lading. I shall therefore hold, until I am otherwise instructed, that where the contract of carriage has been clearly defined in all its particulars by the parties themselves, and there is no imputation of either fraud or mistake against the shipper, but he has fully executed his side of the contract, the other party shall not relieve himself from its performance, by alleging that there has been a want of literal conformity to the provisions of this section. In other words, I will hold the carrier estopped from denying the liability which he has expressed in his bill of lading, if I find in that instrument a substantial, but clear recognition of all the facts which the statute required him to be apprised of. I give the act of congress this interpretation the more willingly, because I cannot believe it was intended to destroy the commercial value of the bill of lading, in the large class of transactions to which the section applies, and to reverse the long established policy of the law, by requiring parol proof as the condition of validating a written contract. For if it be true, that the note in writing must have preceded the entry on the bill; if it must have been given by the shipper, and to the shipowner or his agent; if it must have expressed the true character and value, then the shipper before he can lawfully reclaim his goods, or recover damages for the spoliation of them, must be prepared with proofs, in pais, of all those facts. The bill of lading ceases to be negotiable—its language no longer declares its import.

I might limit the interpretation of this section without, perhaps, changing its operation on the present case, by a reference to some of the words of the act, which were not remarked on, otherwise than incidentally, in the argument. The negation of liability on the part of the shipowners is, after all, not absolute: the section speaks only of a liability "as carriers," leaving the liability under less special contract of bailment unchanged. But I prefer giving a distinct ex-

pression to the opinions I have formed upon the general phraseology of the act. I hold, that on this bill of lading, the shipowners are liable, even as carriers. But I apprehend, that in the case before me, this liability is a barren one. The 3d and 4th sections of the act of congress restrict the owner's liability to "the amount or value of the interest in the vessel and the freight then pending." It is conceded that the steamship Union was totally lost by the disaster which has given rise to this suit; but it is said, that the spoliation of the gold-dust preceded the loss of the ship, and that the measure of the defendant's liability therefore, is her value before the wreck took place. I do not think the evidence sustains the assertion. We do not know exactly the time at which the gold-dust was stolen. It had, beyond all doubt, been removed from the locker, in which it was stored on board, before the captain left the vessel after the wreck. The purser tells us, he passed out all that the locker contained. The box was not missed, however, until the rest of the treasure had been carried ashore, and it was not until twenty-four hours afterwards that it was found broken open, and on board. To my mind, it is reasonably clear, that the box was purloined on its way from the locker to the boat, and was then secreted on board until the next day presented an opportunity for opening it. It could hardly have been stolen before the confusion of the wreck. It was accessible till then, only to two persons, the captain and the stewardess, either of whom, if disposed to rob, might have taken half a million as easily as a thousand dollars worth, and who would either have kept their plunder in its original package-form, to make its removal and secretion easier, or else have thrown the box, which was the badge of ownership, overboard. All the circumstances favor the idea, that the loss would not have taken place if the ship had not gone ashore, and they refer it, I think, with every aspect of probability to the rapacity of third persons, stimulated and screened from detection by the general alarm.

But whether the robbery preceded or followed the moment of wreck, or was contemporaneous with it, is, in my judgment, of no importance. We may, perhaps, gather the meaning of our statute on this branch of the question, from the general maritime law. Whatever may have been the law of the continent in times very long gone by, when the magister, and the exercisor, and the navientarius, and the dominus navis, were sometimes one and sometimes distinct, and when the liabilities of ownership were more or less dependent on the capacity which one or the other of these titles implied, it is certain that since the ordinance of 1681, and even long before, the owners have been liable for the captain's acts to the extent of their interest in the ship and freight, but no further. The exceptions to the universality

of this limitation, were of English parentage, and referred themselves directly to the policy of the ·old common law of that island. The wiser rule of the continent was adopted for Great Britain, in the 7th year of George 2d, some half a century after the ordinance of the French king had defined the commercial usage of the rest of the world. (Judge Washington, in The Seneca.) From the English statute, or rather through it, the provisions which are found in our act of congress, have been derived at second or third hands.

It has been a subject of discussion among some of the French commentators, whether the subsequent loss of the vessel, or its surrender by the owners, released them from the legitimately made contracts of the captain. See Valin, lib. 2, tit. 8, art. 2; Emerigon, Contr. Gr. c. 4, § 11; Poth. Obl. 4511; 1 Boul. P. Dr. Com. 270, &c. But I am not aware that such a question has ever arisen, where the claim to charge the owners was founded on the master's delict or want of skill. At least it may be regarded as settled now, that the owner's liability for the delicts and quasi-delicts of the master, ceases upon a surrender of the vessel with her freight, and does not survive her destruction. See the authors above cited, and 1 Pard. Droit. Commer. pt. 4, tit. 2, c. 3, § 2. The only opinion I have met with, seemingly at variance with this, may be derived from the language of Judge Story, in Pope v. Nickerson [Case No. 11.274]. "Suppose," he says, when speaking of the limited liability of the shipowner, "suppose after the right of action has attached, the ship perishes: that will not affect the right of recovery of the shipper in a case of tort, and a fortiori, it will not in a case of contract, made by the master, by and under the authority of the owners." This doctrine is fully sustained by the cases of Dobree v. Schroder, 6 Sim. 291, 2 Myln. & C. 489, and Wilson v. Dickson, 2 Barn. & Ald. 2. It might be sufficient to remark, that the learned judge was commenting on a statute of Massachusetts, which differed materially from the general law maritime, and from our act of congress, in that it seeems to have made no provision for a surrender of the ship and freight, and thus, as the judge says, left the remedy to be strictly in personam; and that, besides this, the position assumed by him was not necessary, nor perhaps even directly involved in the case he was considering. But I have not found in the cases he refers to, a clear affirmation of the principle for which he invokes them, if that principle is to be extended in its application to the case before me. Dobree v. Schroder turned upon the question whether, where the vessel had made freight once or more after the delict, and had been deteriorated by ordinary wear, her value was to be ascertained at the time of suit brought, or at the time when the right of action accrued; and the case of Wilson v. Dickson was one of collision, in which the defendant's vessel

survived the delict, and was not lost till some time after the right of action had accrued. The first was not a case of total loss: the second, being one of tort and in personam, the right of action attached instanter, and could not be varied by subsequent circumstances. Not so, the liability of a carrier, for goods lost or purloined. He may find them again before the voyage ends, or reclaim them from the thief in time to make delivery in conformity to the terms of his bill of lading. There is no liability, in his case, if the shipper gets his goods according to the contract of carriage; nor can the shipper complain of accident or wreck, though the goods are transhipped in consequence, if they come to him in time and in good order. The right of action against the carrier therefore, unlike that which grows out of a collision, does not accrue till the end of the voyage, or the lapse of a reasonable time for the delivery of the cargo.

It is impossible, however, to give effect to the 4th section of the act of congress, unless we suppose that, in cases of affreightment at least, the measure of his ability is the value of the vessel and freight at the time of suit brought. That section provides, that where the whole value of the vessel and her freight for the voyage shall not be sufficient to make compensation for the losses which the shippers have sustained by the embezzlement, loss, or destruction of their goods, the owner of the vessel may take appropriate proceedings in any court for the purpose of apportioning the amount of his liability among the parties entitled; and that upon the transfer of his interest, in the vessel and freight, to a trustee named by the court, all claims and proceedings against the owner shall cease. How can this "transfer of his interest" pass more than he has at the time? Yet, upon such a present transfer, all claims and proceedings against the owner are to cease;—"claims and proceedings to cease"—implying, clearly, that such proceedings against him may be actually pending at the time of the transfer. The terms of this section may be said to be inapplicable to the case of a total loss, where there remains nothing to transfer; but as both sections relate to the same liability, the 4th giving effect to that which was declared by the 3d, the import of the 3d section becomes altogether clear, namely, that the owner shall not be personally liable, where he has no longer any interest in the ship or her freight. It never could be the purpose of congress, that he who has lost a part of his investment, should be relieved from his liabilities, while his equally innocent neighbor remains bound, because he has lost all.

The policy of our own law is happily explained by Emerigon in his remarks on the corresponding law of France. "The owner's liability," he says, "for the captain's acts, is rather a liability in rem than in personam (nulle que personelle.) While the voyage is in progress, the captain may take up moneys on bottomry, or pledge the apparel of the ship, or even sell his cargo. But this is all. His legal authority does not go beyond the limits of the ship under his command, the ship confided to his administration. He cannot involve the general estate of his owners, unless they have specially authorized him to do so. In the absence of special authority, there is no personal recourse against the owners, unless they elect to retain their interest in the ship; if the ship perishes, or they release their interest in it, they cease to be answerable." Emer. Contr. a la Gr. c. 4, § 11. "And such," says Boulay-Paty, "was the maritime law of the Middle Ages; as appears by the Consulado, c. 33 and 236, Cleirac, Riviéres, art. 15, Kurricke, Stat. of Hamburg, Grotius, and numerous other authors on this title of the law." "And this too." he says, "is the more equitable, inasmuch as the owner is at such a distance from his captain, as to make it impossible to overlook him or even communicate with him. The exposure of the owner's ship and freight to loss, not to speak of the goods he may, himself, have put on board, is quite interest enough to ensure his selection of a reliable captain." 1 Dr. Com. Mar. 269. He expands the same idea some pages further on. After reasserting that the captain's acts and delicts cannot involve his owners beyond the ship and freight, and that they may absolve themselves altogether, by surrendering these interests, he says (page 286): "The owners entrust to the captain's administration only a certain value, that of their ship. To authorize the captain to make them debtors beyond this value, would be to place the fortune of the owners at the mercy of an agent purely special. The ownership of vessels would be altogether too hazardous, if such a power as this were vested in the captain, often a captain not even chosen by the owners; for we know that in the course of a voyage, and in certain cases, the captain may delegate his powers to another, or an unknown person may be appointed by the magistrate to replace the one who was commissioned by the owners." Recognizing, then, the liability of the owners upon a contract of carriage like this, I am of opinion, also, that such liability is at an end, upon the total destruction of the vessel and loss of freight before the completion of the voyage. Nor is there any thing, as it strikes me, in the circumstance that the vessel was insured, and that a loss has been paid on her, or is still payable. The limit of the liability, the subject matter of the surrender in discharge of it, was the "value and amount of the owner's interest." If the vessel has ceased to exist, if the wreck was complete, and there is no longer property in her or in her remains for any one, the owner's interest is gone. He has nothing to surrender. There is not a word in the act about the insurance moneys, which he has received or might claim. These

are not his interest in the vessel. The policy of insurance is a distinct independent subject of property. No equity attaches upon the proceeds of it in favor of third persons, unless there be some contract, agreement, or trust, to that effect. Ellis, Ins. 81. The assignment of a ship passes no interest in an outstanding policy. The fire insurance policy · on a house is a merely personal contract, and it passes even in equity to the executor, not the heir. Mildmay v. Holgham, 3 Ves. 472. A mortgagee has no claim upon its proceeds. Vernon v. Smith, 5 Barn. & Ald. 1. And as the marine policy is a merely personal contract between the insurer and the assured, so the rights of action, which flow from it in case of loss, are strictly personal also. It is not, it never was an interest in the thing insured. In a case of total loss, the rights of the assured to recover by force of it, spring up and have their being only from the moment when his interest in the thing expired.

But if even the vessel had continued to exist in specie, the total loss being constructive only, and made so by abandonment to the underwriters, the law, as it seems to me, would be the same. The underwriters could take no more under an abandonment and cession than the assured had at the time of loss. The ship, in their hands, would be liable still, and primarily, for wages, for salvage, also, for maritime loans, for repairs and supplies furnished abroad, and on hypothecations, implied by the contract of affreightment. The surrender or transfer, contemplated by the act of congress, affects the underwriters no more than did the implied hypothecation, out of which it grows, and for which it can hardly be said to be substituted. Such a transfer is merely the formalization of a trust existing before, a trust now to be administered by the court, instead of the shipowner, an act of law, or under legal sanction, which passes the legal title out of the owner, but leaves the creditors of the vessel in the same plight against her as before. The abandonment is of the residuary interest of the shipowner, of the surplus, if there be any, after payment of all the charges on the ship and freight. Such is the conclusion of Boulay-Paty, after a well-reasoned train of remarks on the same question, under the Code Civile, 1 Dr. Com. Mer. 293. He begins by marking the distinction between the nature and effects of an abandonment to insurers, (delaissement,) and those of a surrender (abandon) by the shipowner to the use of the shippers: "By the abandonment," he says, "the ownership of the thing insured passes to the underwriters, who share it among them pro rata, whether there be loss or profit in the result. The surrender, on the other hand, has a different effect. It is simply a declaration by the owner of the ship, that he no longer asserts any control over the property, but passes it to the shipper, that he may seek payment from it, and not from the owner personally. But, differing in this from the underwriters, the shipper has not become ·an owner. He can only

pay himself his debt; he cannot derive a profit from the surrender. In a word, there is the same difference between them as between an owner and a creditor having a privilegium or hypothecation. The surrender is a renunciation of ownership of the vessel, having for its only object the relief of the owner from the debts which encumber the thing, not a transmission of the ownership to others. It is of the same sort with the act of an heir, when he renounces the inheritance to avoid paying the encumbrances upon it; or the purchaser of mortgaged premises, who gives them up rather than stand liable to the mortgagee; or the debtor, who makes a cession as a bankrupt. The abandonment to the insurers is very different from this. It is an absolute turning over of the thing, for which they are to pay the price; which makes them owners of the thing, and subjects them to all the charges of ownership, unless they prefer surrendering it in their turn. This distinction meets all the objections that can be made. They are all resolved by the different natures of the abandonment and the surrender; the former of which makes an owner, the latter only a creditor of the thing. By the abandonment to the insurers, as they become owners under it, they stand charged with the debts which encumbered the thing before, and which still adhere to it; while the surrender to creditors has no other effect than a declaration that the former owner of the thing asserts no right over it any longer, and that the creditors must seek it, in whose hands soever it may be, to get payment from it. It follows that the shipowner may, by such a surrender, turn over the shipper against the insurers, who have become, by the abandonment, owners of ship and freight, and thus make abandonment and surrender both. The abandonment will not on that account be partial; for the shipowner, though bound to convey the entire thing, to wit, the ship with its freight, is not on that account bound to clear it of the debts with which the acts of the captain have encumbered it during his administration. Such debts are a natural charge upon the thing, diminishing its value, but not hindering its integral transfer, subject to the charge." Returning again, after some paragraphs, to the same subject, he says, (page 297:) "The product of the insurance is the consideration (prix) of the premium which the shipowner has paid to insure her. This premium is not pledged (affectée à garantie) for the obligations of the captain: the law pledges only the ship and freight; consequently the shippers have no right upon the insurance moneys. They do not in general represent the ship, but become, when the ship is lost, the basis of a direct personal action in favor of the assured."

I have found a single line in Pardessus, which does not consist with this doctrine of Boulay-Paty. It forms part of the section I have quoted before. Referring to the surrender by a shipowner, which relieves him from personal liability, he says: "It follows, that if

the ship has been insured, the owner should surrender his rights against the underwriters." He does not expand the position beyond the words I have quoted, and does not sustain it either by argument or authority. The reasoning of Boulay-Paty, who wrote afterwards, seems to me unanswerable; and it is borne out by the established policy of commercial institutions. It would discourage insurances, were we to deny to the shipowner the benefit of the contract for which he has paid his premium. It would discriminate to the disadvantage of the small capitalist, who must insure with third persons, in favor of the millionaire, whose extended means allow him to stand his own underwriter, and who, not receiving the amount of loss from third persons, would not be called on to pay it over to the shipper; or to the disadvantage of the prudent, in favor of the reckless. What matters it to the shipper, whether the ship was insured by the owner himself or by a third party? What right can he claim in the one case more than in the other? He did not in either case contribute towards the premium of insurance; it added nothing to the freight he engaged to pay; he never stipulated that the ship should be insured at all, nor inquired whether it was so. He gave credit, when he shipped, to the vessel; she became hypothecated to him as she stood; the owner's liability was measured by her value. What has he to do with the other contracts of the owner, whether made afterwards or before? What right has he to expect that the fruits of them shall be superadded to the only security for which he bargained? Besides, the hypothecation between ship and cargo is reciprocal. Each is bound to the other; and both, I suppose, should be bound alike, and with the same incidents. If the owner's policy on the ship is to enure to the indemnity of the shipper of cargo, must not the shipper's insurance on his goods be pledged for the payment of freight, and be taxed accordingly, where the freight has been otherwise lost by a peril of the seas? But it is unnecessary to follow out this train of remark. If it were never so desirable to turn over the policy on the ship to the profit or indemnity of the shipper of cargo, and if it were not of all things the easiest to cover up the fact that such an insurance was in existence, a simple restriction of the assignable quality of the instrument, such as we find in our policies against fire, would make the effort futile. A single line of memorandum would do the business. I cannot hold, therefore, the amount whatever it may be, that has been paid or that may be payable by the insurers, as a part of the defendants' interest in the ship and her freight. The result is, that there can be no recovery against the owners as such.

As to the individual liability of Captain Marks. I have only to say, that it is not a question on these pleadings. As the master of the ship, however ably and faithfully he may have borne himself in circumstances of singular embarrassment and difficulty, I am not prepared to affirm that, as a carrier, he has brought himself within the exceptions of his bill of lading. But the only issue I am called on to decide is between the shippers and the owners as such. My decree must be for the defendants.

Decree for defendants, with costs.